FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, AND THE STATE OF FLORIDA *ex rel*. Charles Hodge, <br><br> Plaintiffs, <br><br> v. <br><br> WALMART INC. <br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.** 8:2020cv 1385 T33cpT <br><br> **JURY TRIAL DEMANDED** |

**RELATOR'S COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ*. AND**
**THE FLORIDA FALSE CLAIMS ACT § 68.081, FLA. STAT. *ET SEQ*.**

The relator, Charles Hodge ("Relator"), on behalf of the United States and the State of

Florida, brings this action against defendant WalMart Inc. ("Defendant" or "Walmart") for

violations of the federal False Claims Act, 31 U.S.C. §§3729 *et seq*. ("False Claims Act") and the

Florida False Claims Act, Fla. Stat. § 68.081 *et seq*. (collectively "False Claims Acts"), to recover

all damages, civil penalties and all other recoveries provided for under the False Claims Acts.

## I.   THE PARTIES

1.      Defendant WalMart Inc. is a publicly traded Delaware corporation with its principal

place of business located at 702 SW 8th Street, Bentonville, Arkansas 60555, but doing business

throughout the United States. Walmart operates thousands of pharmacies across the United States.

Walmart employs pharmacy technicians and pharmacists to operate its pharmacies. These pharmacy

technicians and/or pharmacists submit claims to government healthcare programs including

Medicare PDP Sponsors for dispensing prescriptions for Medicare Part D enrollees. Further,

Walmart's pharmacy technicians and pharmacists submit claims to private contractors (that have in



1

turn contracted with state governments to process claims for Medicaid enrollees) for dispensing prescriptions to Medicaid enrollees.

2.      The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Center for Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid Programs.

3.      The State of Florida is a plaintiff to this action.  The State of Florida through the Florida Agency for Health Care Administration ("AHCA") administers the Florida Medicaid Program. The Medicaid Program, 42 U.S.C. § 1396 *et seq.*, is a government health insurance program funded jointly by the federal and Florida state governments.  Florida administers its own Medicaid program; however, the program is governed by Federal statutes, regulations and guidelines.  The federal portion of Florida Medicaid payments – the Federal Medical Assistance Percentage – is based on a Florida's per capita income compared to the national average.

4.      Throughout the relevant time period, the services specified herein were provided to Medicare, Tricare, Veterans and Medicaid beneficiaries in Florida.

5.      Relator Charles Hodge ("Relator") has held a pharmacist license for over 15 years. He has never been sanctioned or otherwise disciplined by the Florida Pharmacy Board or any other regulatory agency charged with the regulation of pharmacists. Relator began working for Defendant in Store #2695 and Store #5299 as a staff pharmacist and/or managing pharmacist from 2005 to 2020. Throughout his tenure at Walmart, Relator consistently received positive reviews of his performance.

6.      Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1).  Relator brings this action on behalf of the United States for violations of the Florida and Federal False Claims Acts.

2

7.      Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

## II.  SUMMARY OF THE CASE

8.      This case involves the pharmacy operations of Walmart and its scheme to bill the government for medication dispensed to beneficiaries with expired expiration dates or no expiration date information or lot number.

9.      Relator, a pharmacist in a Walmart store in Florida, began noticing the misbranded and expired drugs on Walmart pharmacy shelves in early 2019.

10.     In June 2019, Relator started to complain in earnest and with greater specificity, in writing, to management including members of Walmart's Regional Management, Health and Wellness Department, Ethics department, and ultimately to Mr. Doug McMillen, Chief Executive Officer ("CEO") of Walmart about the expired and misbranded drugs.

11.     Relator's complaints included but were not limited to:

a.  Bottles containing medications well past their expiration dates on the Walmart pharmacy shelves;

b.  Bottles with no expiration dates or lot numbers on the Walmart pharmacy shelves;

c.  Technicians pulling out of date drugs and handing them to the pharmacists to approve for dispensing;

d.  Technicians handing pharmacists drugs in bottles which lacked any expiration date or lot number to approve for dispensing;

e.  Walmart pharmacists dispensing out of date or misbranded drugs;

f.  Medicare and Medicaid billed for out of date and misbranded drugs dispensed to the customers at Walmart; and

g.  Expiration dates and lot numbers on drugs that were failing when technicians removed labels from those bottles leaving the bottle unmarked and thus unsalable.

12.  As Relator's complaints increased, the retaliation against him from his Walmart supervisors increased.

13.  Walmart conducted a superficial investigation into Relator's complaints, and on one instance 3-4 large boxes of out of date and misbranded drugs were removed from his Walmart store. Relator reported that expired bottles were not just recently expired but included a great number of drugs that had expired in 2018 and early 2019.

14.  Relator was terminated in February 2020.

### III.   JURISDICTION AND VENUE

15.  Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b) and also 28 U.S.C. §§ 1331, 1345.

16.  Venue in the Middle District of Florida is appropriate under 31 U.S.C. § 3732(a) and sufficient contacts exist for jurisdiction in that Defendants transact or transacted business in the Middle District of Florida.

### IV.   THE FALSE CLAIMS ACTS

17.  The federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

18.  The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of

4

the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

19. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

20. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

21. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

22. Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 81 Fed. Reg. 42491 (2016) and the Civil Monetary Penalties Inflation Adjustment for 2018, 83 FR 3944 (Jan. 29, 2018), the civil monetary penalties under the FCA were adjusted to $11,181 to $22,363 for violations occurring on or after January 29, 2018 that are assessed after February 3, 2017. See 28 C.F.R. § 85.5.

23.     Florida has enacted a False Claims Act modeled after the federal False Claims Act and contains provisions similar to those quoted above. *See* Fla. Stat. § 68.081 *et seq*. Relator asserts claims under the Florida False Claims Act to recover for the State of Florida the amount it provided Defendants in payment of the false claims presented to its Medicaid program alleged herein.

## V.    GOVERNMENT HEALTHCARE PROGRAMS' PAYMENT OF PRESCRIPTION DRUG CLAIMS

### A.  Medicare Part D

24.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

25.     The Secretary of HHS administers the Medicare Program through CMS, an operating division of HHS.

26.     The Medicare Program is comprised of four parts. Medicare D is the only Part at issue in this case.

27.     Medicare Part D is a voluntary prescription drug benefit program for Medicare enrollees that became effective on January 1, 2006. 42 U.S.C. § 1395w-101 *et seq.*

28.     Medicare Part D coverage is offered through private companies, known as Part D sponsors, which contract with CMS to administer prescription drug plans ("PDPs").

29.     CMS gives each Part D sponsor advance monthly payments consisting of the PDP's direct subsidy per enrollee (which is based on a standardized bid made by the Part D sponsor), estimated reinsurance subsidies for catastrophic coverage, and estimated low-income subsidies. 42 C.F.R. § 423.31 5, 423.320.

30.     The United States does not pay pharmacies directly. Rather, the United States pays Medicare Part D Plan Sponsors, which are typically private insurance companies, to reimburse retail pharmacies, (called "downstream entities" under 42 C.F.R. § 423.4 or "network pharmacies"), either directly or through contractors known as pharmacy benefit managers ("PBMs").

31.     Throughout the plan year, each time a Medicare beneficiary has a prescription filled under Part D, when a pharmacy such as Walmart dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives payment from the Part D Plan Sponsor for the price remaining after the beneficiary pays his or her portion of the price of the prescription drug.

32.     Then the sponsor receives a claim from the pharmacy and notifies CMS of the event, including the cost the sponsor has incurred. At the end of the plan year, CMS reconciles the advance payments paid to each Part D sponsor with the actual costs the sponsor has incurred.

33.     At the reconciliation point, if CMS underpaid the Part D Sponsor for low-income subsidies or reinsurance costs, CMS makes up the difference. If CMS overpaid the Part D Sponsor for these costs, it recoups the overpayment from the Sponsor. 42 C.F.R. § 423.343.

34.     In the pharmacy industry, the PBM third-party administrators typically act as intermediaries between retail pharmacies and insurers, facilitating the processing and payment of prescription drug claims, including the payment of reimbursement monies to pharmacies and the submission of cost data to the Government on behalf of the Part D Plan Sponsor.

35.     Walmart, as a contract provider for a Part D Plan Sponsor, is required to comply with all applicable "federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(4)(vi).

7

36.     Walmart also expressly "agrees to comply with Federal laws and regulations designed to prevent fraud, waste and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act," 32 U.S.C. §§ 2729 *et seq.* 42 C.F.R. 423.505(h)(1).

37.     Walmart, as a contract provider for a Part D Plan Sponsor, is also required to comply with all applicable pharmacy and prescription drug state standards as part of its contractual agreement. 42 C.F.R. § 423.504(b)(iv)(A).

38.     Walmart, as a contract provider for a Part D Plan Sponsor, certifies that the claims data it submits to the Government agencies is accurate, complete, and truthful and that the claims data will be used to obtain Government payments. 42 C.F.R. § 423.505 (k)(3).

39.     As a contract provider for a Part D Plan Sponsor, through PBMs and the Sponsor, Walmart sends data to CMS to support its claims for Government payment on a Prescription Drug Event ("PDE") record.

40.     The PDE record must include accurate data including the drug dispensed, the prescription number, the dispensing fee paid to the pharmacy, the cost of the drug, the quantity dispensed, and the provider who ordered the medication, including the provider's unique identifying number assigned by the licensing State or District.

41.     Compliance with the requirement that such PDE data is "true, accurate, and complete" is a condition of payment under the Medicare Part D program.

42.     The PDE submission form specifically requires pharmacies to identify "the dispensed drug using a National Drug Code" ("NDC"), an eleven (11)-digit number assigned to the drug by its manufacturer and attached to the product container at the time of packaging.

43. The NDC identifies the product manufacturer, dose form and strength, and the package size. NDCs must be assigned pursuant to Federal drug law. 21 C.F.R. 210.25(c)(l).

44. In turn, 21 C.F.R. §§21 l.137(a) and (d) require manufacturers or labelers to assign an expiration date to each pharmaceutical product. Using the drug products' NDCs, CMS keeps track of expiration dates in a Medicare Part D "data bank" to monitor the expiration for all drugs covered by the Medicare Part D program.

45. Moreover, as discussed in detail below, in addition to submitting accurate prescription data, retail pharmacies participating in Medicare Part D must dispense Part D drugs in accordance with applicable state pharmacy laws and regulations. 42 C.FR. §§423.504(b)(iv)(A), 423.153(c)(l), many of which in turn expressly require that retail pharmacies dispense drugs with accurate expiration date information.

46. PDEs submitted to Medicare for prescription medication dispensed without the prescribed drug quantity or accurate expiration date do not contain accurate, complete, and truthful information about all data related to payment and are thus false claims for payment.

47. As a result of Walmart's fraudulent scheme, CMS has, through Part D Plan Sponsors and/or PBMs, made payments to Walmart for Part D claims submitted with materially false PDE data.

**B. The Medicaid Program**

48. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq*., established what is commonly known as the Medicaid Program ("Medicaid"). Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The United States provides matching funds to a state to fund the program and also ensures that the state complies with minimum standards in the administration of the Medicaid Program.

49.     Medicaid programs are administered by the states in accordance with federal statutes and regulations and pursuant to state plans which must be approved by the Secretary of HHS. *See* 42 C.F.R. § 430.0.

50.     The State of Florida has elected to participate in the Medicaid program, and has elected to offer prescription drug coverage to Medicaid beneficiaries.

51.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).

52.     The Medicaid statute requires each participating state to implement and administer a state plan for medical assistance services which contains certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

53.     These requirements include a comprehensive description of the State Medicaid agency's payment methodology for prescription drugs. 42 C.F.R. § 447.518.

**C.  Tricare**

54.     Tricare, formerly known as the Civilian Health and Medical Program of the Uniformed Services, is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents. Tricare contracts with a fiscal intermediary that receives, adjudicates, processes, and pays health care claims submitted to it by Tricare beneficiaries or providers. The funds used to pay the Tricare claims are federal government funds. In addition to Medicare, Medicaid, and Tricare, the federal government also reimburses for the cost of prescription drugs under several other government healthcare programs, including the Railroad Retirement Medicare Program, the Federal Employee

Health Benefit Plans, the Veterans Administration, the Indian Health Service and State Legal Immigrant Assistance Grants.

### D. Veteran's Health Administration

55.     The Veteran Health Administration is the component of the U.S. Department of Veterans Affairs ("VA") that implements the medical assistance program of the VA through the administration and operation of numerous VA outpatient clinics, hospitals, medical centers, and long-term healthcare facilities. The VA provides numerous prescription drugs in connection with VA programs and obtains funds from the federal government.

56.     Medicare, Medicaid, Tricare and Veteran Health Administration are referred to herein collectively as "Government Healthcare Programs."

## VI.    GOVERNMENT HEALTHCARE PROGRAMS DO NOT REIMBURSE FOR EXPIRED AND/OR MISBRANDED DRUGS

57.     The United States Food and Drug Administration ("FDA") is the federal agency within the executive branch of the government responsible for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"). Among the purposes of the FDCA is to assure that drugs sold for human use are safe, effective, and bore accurate labeling containing all required information. To that end, the FDA's responsibilities under the FDCA include regulating the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce.

58.     Under the FDCA, drugs are defined as, among other things, articles intended for use in the cure, mitigation, treatment or prevention of disease in humans (21 U.S.C. § 321(g)(l)(B)); articles intended to affect the structure or function of the body of humans (21 U.S.C. § 321(g)(l)(C)); or articles intended for use as components of other drugs (21 U.S.C. § 321 (g)(1)(D)).

59.     Prescription drugs are defined under the FDCA as: (a) those drugs which, because of their toxicity or other potentiality for harmful effect, or the method of their use, or the collateral measures necessary to their use, were not safe for use except under the supervision of a practitioner licensed by law to administer such drug; and (b) those drugs limited by an FDA-approved application to use under the professional supervision of a licensed medical practitioner (21 U.S.C. §§ 353(b)(l)(A),(B)).

60.     The term "label" is defined as a display of written, printed, or graphic matter upon the immediate container of any article. (21 U.S.C. § 32l(k)). The term "labeling" is broader and included all labels and other printed or graphic matter upon any article or any of its containers or wrappers or accompanying such article. (21 U.S.C. § 32l(m)).

61.     The FDA requires specific labeling on drugs. This labeling includes the drugs expiration date. Pursuant to 21 C.F.R. § 211.137, prescription drug labelers must assign each drug produced an expiration date to ensure that the drug meets certain standards, including strength and quality and purity, at the time of its use. The expiration date effectively establishes a shelf-life for the drug. 21 C.F.R. § 211.137 continues, "[e]xpiration dates shall appear on labeling in accordance with the requirements of [21 C.F.R. §]201.17."

62.     Pursuant to 21 C.F.R. §201.17, the expiration date "shall appear on the immediate container and also the outer package, if any."

63.     In addition to the FDA labeling requirements, and because Congress was concerned about expired drugs, the Prescription Drug Marketing Act of 1987 ("PDMA") was enacted (1) to ensure that drug products purchased by consumers are safe and effective, and (2) to avoid the unacceptable risk to American consumers from counterfeit, adulterated, misbranded, subpotent, or expired drugs.

12

64.     The FDA issued regulations implementing the PDMA in 1990 (21 C.F.R. Part 205) and 1999 (21 C.F.R. Part 203).

65.     If a drugs label, including the expiration date and other items, is false or misleading, the drug is "misbranded." Specifically, a drug is misbranded if, among other things: its labeling was false or misleading in any particular manner (21 U.S.C. § 352(a)) or its labeling did not bear adequate directions for use (21 U.S.C. § 352 (f)(l)). The FDA has defined "adequate directions for use" to mean "directions under which the lay[person] can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5.

66.     A drug or biologic's labeling must not be inaccurate or otherwise misleading in any way. *See* 21 C.F.R. § 201.56(a)(2); *see also* 21 U.S.C. § 321(m), (n).

67.     The FDCA prohibits the introduction or delivery for introduction, or to cause the introduction or delivery for introduction, into interstate commerce of a misbranded drug or biologic. 21 U.S.C. §§ 33l(a), 331(k), & 333(a). Specifically, 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any ...drug... that is ...misbranded." 21 U.S.C. §§ 331(k) prohibits the "alteration, mutilation, destruction, obliteration, ore removal of the whole or any part of the labeling of, or the doing of any other act with respect to , a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

68.     Misbranded drugs, such as drugs without expiration dates or drugs that are expired are not "approved" by the FDA and therefore not eligible for reimbursement from Government Healthcare Programs.

69.     Under Government Healthcare Plans (Medicare, Medicaid, Tricare, Veteran's Health Administration), reimbursement is available only for covered outpatient drugs, which pursuant to 42 U.S.C. §1396r-8(k)(3), only includes drugs that are used for "a medically accepted indication," defined in 42 U.S.C. §1396r-8(k)(6) to be a use "which is approved under" the FDCA or included in certain drug compendia identified in 42 U.S.C. §1396r-8(g)(1)(B)(i). As described below:

a.  **Medicare Part D and Medicaid.** Part D covers the cost of FDA-approved prescription drugs used for a medically accepted indication. *See* 42 U.S.C. 1395w-102(e)(1), 1395w-151(a)(2). Just as in the Medicaid Program, for Medicare Part D reimbursement, a medically accepted indication means any use or indication which is approved by the FDA or which is supported by one or more citations in certain drug compendia. *See* 42 U.S.C. 1396r-8(k)(6) & (g)(1)(B)(i). The relevant drug compendia are the same as those for Medicaid: AHFS Drug Information and USP DI (or its successor publications). *See* 42 U.S.C. 1396r-8(g)(1)(B)(i). In sum, Part D drug coverage excludes drugs not approved by the FDA, and those not for use for a medically accepted indication.

b.  **Tricare:** Tricare categorically excludes coverage for [u]nproven drugs. 32 C.F.R. 199.4(g)(15). Tricare defines unproven as lacking necessary FDA approval. 32 C.F.R. 199.4(g)(15)(i)(A)-(B). Thus, under Tricare, benefits may not be extended for drugs not approved by the FDA.

c.  **Veteran's Health Administration:** With respect to the VA, the federal reimbursement scheme provides that prescription drugs are only reimbursable if they are FDA-approved or otherwise medically accepted to treat the particular

14

diagnosis for which the drug is prescribed. *See* 38 U.S.C. 8126. A medically accepted indication means any use or indication which has been approved by the FDA or which is supported by one or more citations in certain drug compendia. *See* 42 U.S.C. 1396r-8(k)(6), (g)(1)(B)(i). The relevant drug compendia are the same as those for Medicaid: AHFS Drug Information and USP DI (or its successor publications). *See* 42 U.S.C. 1396r-8(g)(1)(B)(i). In sum, VA drug coverage excludes drugs not approved by the FDA, and those not used for a medically accepted indication.

70.     Additionally, Medicare Part D obligates pharmacies to comply with minimum standards for pharmacy practice as established by the states. 42 C.F.R. § 423.153.

71.     For example, the District of Columbia and the states of Alaska, Arizona, California, Colorado, Delaware, Florida, Georgia, Massachusetts, Minnesota, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Wisconsin, and Wyoming are among those states that prohibit dispensing expired drugs for all payors, including Medicare Part D.

72.     These states' laws, which require the quarantine, destruction, return of, or directly prohibit dispensing expired drugs, constitute the minimum standards for pharmacy practice with which Medicare Part D requires compliance. [1]

---

[1] The State laws, rules, or regulations referenced above include Alaska: Alaska Admin. Code tit. 12, §52.410; Arizona: Arizona Admin. Code §§ R4-23-658, R4-23-701; California: Cal. Admin. Code tit. 16, § 1718.1; Colorado: 3 Colo. Code Regs. §719-1:3.00.40; Delaware: 24 Del. Code Regs. § 2500-2; District of Columbia: DCMR, tit. 22, 1901.6; Florida: Fla. Stat. §§ 499.0121, 499.005-.006; Georgia: Ga. Comp. R. & Regs. 480-10-.11; 480-28-.07; Massachusetts: 247 Mass. Code Regs. 9.01; Minnesota: Minn. Admin. R. 6800.0100, Minn. Stat. §151.415; Mississippi: Miss. Code R. 30-20-1:XI, XXX; Nevada: Nev. Rev. Stat. §639.282; New Jersey: N.J. Admin. Code. §13:39-7.18; New York: N.Y. Codes R. & Regs. tit. 8, § 29.7; Ohio: Ohio Rev. Code Ann. § 3715.521; Oklahoma: Okla. Admin. Code §§535:10-3-1.2(26),535:15-3-11(c); Oregon: Or.

73.     If a pharmacy does not abide the state pharmacy laws, rules and regulations, and dispenses expired or misbranded drugs, it has made false certifications to the Government.

74.     Additionally, expired drugs are not "reasonable and necessary" for medical diagnosis or treatment, and as such may be excluded from Medicare coverage. Social Security Act, §§ 1862(a)(1)(A) & D-2(e)(3); Centers for Medicare and Medicaid Services, "Prescription Drug Benefit Manual, Chapter 6 - Part D Drugs and Formulary Requirements," Rev. 10, 02-19-2010 at 15-16.

75.     Expired drugs are also non-reimbursable by Medicare Part D and Medicaid because they amount to "worthless services," the performance of which "is so deficient that for all practical purposes it is the equivalent of no performance at all" *Mike v. v. Strauss*, 274 F.3d 687, 703 (2d. Cir. 2001).

76.     CMS has identified dispensation of expired drugs as a pharmacy practice constituting Medicare fraud, waste, and abuse. Centers for Medicare and Medicaid Services, "Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste and Abuse," Rev.2, 04-25-2006 at 58.

## VII.     **RELEVANT FACTUAL BACKGROUND**

### A. **Walmart's Organizational Structure**

77.     The largest company in the world by revenue, Walmart has grown into a multinational retail corporation famous for its discount department and grocery stores marketing to the world on the basis of its low prices.

---

Admin. R. 855-041-1025; Pennsylvania: 49 Pa. Code § 27.14; South Carolina: S.C. Code Ann. §40-43-86 (1976); Tennessee: Tenn. Comp. R. &Regs. 1140-03-.11; Texas: 22 Tex. Admin. Code §§ 281.7, 281.8; Utah: Utah Code Ann. § 58-17b-502; Wisconsin: Wis. Admin. Code Phar. 10.03(4); and Wyoming: Wyo. Stat. Ann § 33-24-101 (1977), 8 Wyo. Code. R. Pharm. §15.

78.     As of January 31, 2018, Walmart had 11,718 stores worldwide, with over 5,000 of its stores located in the United States of America. About 3,500 of the Walmart stores in the United States include pharmacies.

79.     Each Walmart pharmacy dispenses from 200 to 400-plus prescriptions daily.

80.     Walmart earned $18.47 billion in prescription sales in 2017 and $20.9 billion in prescription sales in 2018.[2]

81.     Walmart receives money originating from the United States as payment for dispensing prescriptions for patients who have Medicare, Medicaid, Tricare or Veteran's Health insurance.

82.     Pharmacy technicians and pharmacists who work for Walmart have authority to bill Government Healthcare Programs for patients who are eligible to receive Medicare, Medicaid, Tricare or Veterans Health Insurance.

83.     About half of Walmart's dispensed prescription drugs are for Government Beneficiaries.

84.     In 2018 in the United States, Walmart filled 1,053,753,647 Medicare prescriptions and 616,957,721 Medicaid prescriptions.

85.     Walmart organizes its business into three Merchandise Units: Grocery, General Merchandise, and Health and Wellness. Walmart's pharmacy operations constitute the largest component of its Health and Wellness Unit in terms of revenue, profits, and personnel.

86.     Although Walmart does not publicly disclose the revenue and profit margins of its merchandise units separately, its annual report for its Fiscal Year 2017 states that Walmart's Health

---

[2] *See* "Top 15 US pharmacies by total prescription revenue," Alia Paavola, Becker Hospital Review, April 19, 2019, *available at* https://www.beckershospitalreview.com/pharmacy/top-15-us-pharmacies-by-total-prescription-revenue.html (last visited March 21, 2020).

and Wellness unit accounted for 11% of its $495.8 billion in net sales and includes pharmacy, optical services, clinical services, over-the-counter drugs, and other medical products.

87.     Walmart employs roughly 10,500 pharmacists. In July 2019, Walmart announced that it would be contracting its pharmacy workforce by about 3%, including reducing the number of senior pharmacists by as much as 40%, even while it is expanding its vaccine offering.

88.     Walmart's pharmacy managers are its legally designated "pharmacists-in-charge" ("PICs") under state laws, and accordingly are legally responsible pursuant to their professional license and Drug Enforcement Agency certification for overseeing all pharmacy operations, including the prescription-filling process, inventory control, and supervision of staff that Walmart assigns to its retail pharmacy operations.

89.     Pharmacy managers of Walmart pharmacies report to corporate-level Health and Wellness Directors by market Regions. The Health and Wellness Director for Walmart pharmacy managers for stores in the Southeast Region, including Relator's store, during Relator's employment was Anthony Nation (until approximately the Spring of 2018) and then after Mr. Nation, Karen Stein until very recently.

90.     Market Health and Wellness Directors like Mr. Nation and Ms. Stein report to one of the approximately 35 Regional Health and Wellness Directors. The Regional Director Health and Wellness overseeing the Southeast pharmacy market was, during Relator's employment, and continues to be, Rene Pabon.

91.     These and other Regional Directors report to senior management personnel generally based in Walmart's Bentonville, Arkansas corporate headquarters. In July 2018, Walmart Chief Executive Officer Douglas McMillon announced his new direct report, Sean Slovenski, as Walmart's Senior Vice President of Health & Wellness. Reporting to Slovenski as of mid-2018

were Paul Beahm, Senior Vice President of Health and Wellness Operations; Cory Gundberg, Senior Vice President of Health and Wellness – Lead in Pharmacy; Sandy Ryan, Vice President of Clinics and Quality; Luke Kleyn, Vice President of Payer Relations; Marcus Osborne, Vice President of Health and Wellness Transformation; Jinali Desai, Vice President and DMM of Rx Merchandising; and Mony Iyer, Vice President of Optical.

92.     While Walmart's nationwide policies and procedures are devised, approved, and enforced at the corporate and regional management level, the day-to-day operations of the pharmacies within each of Walmart's pharmacy sales' districts are managed and overseen by at least two Clinical Services Managers ("CSMs") who manage the pharmacies' "clinical" operations with regard to company-wide initiatives.

93.     The Clinical Services Manager in Relator's district, was, during Relator's employment and thereafter, Karen Stein, until she was promoted to Health & Wellness Director.

**B.  Walmart Pharmacy Procedures and Policies**

94.     Walmart utilizes certain company-wide Standard Operating Procedures ("SOPs") for pharmacy operations for all Walmart pharmacies throughout the United States. These SOPS are developed with the input and approval of Walmart corporate and regional-level managers, respectively, and enforced by District and Market-level Directors who in turn report to Regional Directors, following the chain of command described above.

95.     The individual SOPs are posted on Walmart's corporate Pharmacy Operations Manual, available electronically to all Walmart pharmacy employees via Walmart's companywide intranet, known as "the Wire."

96.     Likewise, Walmart pharmacies nationwide use pharmacy management software "Connexus" ("Connects Us to our patients"), which receives, contains, and generates the

information and documentation necessary to complete the prescription-filling process laid out in Walmart's SOPs.

97.     Here, Standard Operating Procedure, known as "POM 1009" and entitled "Visual Verification," is particularly important.  The Walmart "Visual Verification" procedure consists of a pharmacist comparing the contents of a filled prescription with a computer medication image. Once a match is confirmed, the Pharmacist places the medication package into "will-call bags" and hangs them on the "bagging rack" to await finalization of the "bagging" process, which involves the printing and insertion of a "monograph" patient education document, which generally includes descriptive information about the drug, its uses and side effects.

98.     The Walmart prescription filling process begins when a patient's prescription is submitted to the pharmacy, either in-person by the patient or, as is increasingly common, electronically, in which case some information may be automatically entered by Connexus but must be verified by technicians pursuant to nine-step SOP.

99.     The in-person drop-off triggers an SOP referred to by Walmart as "Drop Off for Success," which lays out a basic script beginning with "Good morning/afternoon" for staff to follow upon first receiving a beneficiary's prescription. scheduling a pickup time for the patient to retrieve their filled prescription and entering it into the Connexus system.

100.    The Walmart staff then proceeds to the "Input" station, where other Walmart staff enter the prescription information into Walmart's Connexus software system described below.

101.    The "fill" process, POM 1008, is completed entirely by staff referred to as "technicians" when the time approaches for a prescription to be picked up. The process hinges on the use of a hand-held "Scanning for Accuracy" ("SFA") device, which lists patients' with prescriptions that are ready to be filled based on the scheduled "patient promise" pick up time.

102. The Walmart staff then generally scans the "will-call" bag, retrieves the medication from the shelf, scans it, retrieves an empty package, and then proceeds to a cubicle desk area "Fill Station" where the drugs are counted and the package filled.

103. With the goal to continuously increase the average 175 to 200 prescriptions filled daily per Walmart pharmacy, Walmart's corporate managers, including the Pharmacy Market Directors, closely monitor the speed with which Walmart staff fill prescriptions.

104. These Walmart Pharmacy Market Directors time and track the number of prescriptions filled as well as the precise percentage of those that are filled "on time," generally defined as within twenty (20) minutes of the scheduled pick up time with regard to in-store pickups.

105. The tracked performance metrics are recorded in Walmart's "Order Completion Performance" reports at are mandatory pursuant to Walmart corporate requirements.

106. However, to increase the pressure to meet these performance metrics, Walmart employs a computer-based real-time prescription-filling progress monitoring system that monitors the prescriptions coming "due" for pickup within thirty (30) minutes, two (2) hours and forty-eight (48) hours.

107. When a pharmacist is "falling behind," based on an internal, computer-generated schedule to which pharmacists are not privy, the system begins to flash yellow or red depending on how "behind" the pharmacist is, based on the above fill-time expectations intended only to maximize fill speed with a conscious, reckless disregard of the negative impact such a system has on the accuracy of the prescription filling process. The pharmacists see the flashing yellows or reds on the screen, which is intended to and does pressure the pharmacist to fill prescriptions with superhuman speed.

21

108.    With regard to expired drugs, several times a year, according to internal policies, Walmart pharmacy technicians were, and are, to identify drugs (that have been identified by various non-usage reports) that may expire on the shelf without being used. These drugs are returned to one of Walmart's distribution centers to be used at other pharmacies.

109.    On a corporate-wide basis as described in its POM 1008, Walmart programs its software to automatically generate a one-year expiration date recorded in the paperwork that accompanies each prescription. With this as the benchmark, Walmart's policy is to have Pharmacists and staff acting as Pharmacy Technicians check the existing inventory monthly to detect and generally remove all medications· that expire within (3) three months thereafter, pursuant to its POM 814.

110.    Also, for dispensing drugs, Walmart's strictly controlled filling system does not have a prompt for pharmacy technicians or pharmacists to check the expiration date of the prescription when they are dispensing and reimbursing for drugs. Walmart does time each step of the filling process and reprimand pharmacy technicians or pharmacists who take too long to complete any of the steps. (Pharmacists see the manufacturer's container for prescriptions for eye-drops, eardrops, creams, ointments, liquids, and injections.)

111.    Of utmost importance, on the pharmacist's visual verify screen of Connexus the expiration date does not appear; additionally, the expiration date does not appear of the "four-point" screen, the only other screen that a pharmacist typically sees while dispensing and submitting a claim for reimbursement of a prescription. The only way to change the expiration date, if a pharmacist thought of it, is to press the "F9" function key to enter another screen. However, it is official corporate policy for pharmacists not to enter this screen (it would slow the process down too much and jeopardize profits and bonus checks) where they could change the

expiration date. Walmart tracks the number of times that a pharmacist uses the "F9" key to correct errors of any type on prescriptions. This data is compiled for each store and each district.

112.    Connexus allows pharmacists to submit these prescriptions without any human being checking the validity of the expiration date against manufacturer stock bottles on the shelf to be sure they match and to shorten expiration dates submitted to Government Healthcare Programs when the manufacturer's stock bottle expires in less than one year.

113.    This process, not requiring checking the dates and not requiring manual inserting of dates, speeds filling prescriptions, increases the number of prescriptions that each pharmacy can fill and sell each day, increases sales, and increases bonus checks for managers.

114.    In other words, at no time in the process, are pharmacists specifically required to check the expiration date when they are dispensing and reimbursing for drugs: this would slow dispensing prescriptions, decreasing the amount of prescriptions that a pharmacy could fill, decreasing sales. The only time that pharmacists see the stock bottle is when a new drug has just entered the market and the drug's picture has not yet been uploaded to a database that shows the picture of the tablet or capsule to pharmacists when they check the prescription.

115.    While Walmart's "POM 1008" fill procedure purports to require its staff acting as pharmacy technicians to calculate accurate expiration dates and then use a black marker to relabel the prescription container by crossing out the one-year indication, this does not occur, and Walmart is well aware that its staff acting as pharmacy technicians routinely omit this so-called requirement.

116.    As outlined above, both state and Federal law require that medications be dispensed with accurate expiration information pursuant to an inventory monitoring system that accurately accounts for drugs' respective expiration dates, i.e., the date when the drug loses its effectiveness.

117.    Walmart pharmacies purchase medication in bulk from manufacturers and dispense them individually to patient Beneficiaries.

## C. Walmart Dispenses and Receives Reimbursement from Government Healthcare Programs for Misbranded and/or Expired Drugs

118.    Relator has held a pharmacist license for over 15 years. He has never been sanctioned or otherwise disciplined by the Florida Pharmacy Board or any other regulatory agency charged with the regulation of pharmacists.

119.    Relator began working for Defendant in Store #2695 and Store #5299 as a pharmacy manager from 2005 to approximately 2015, and staff pharmacist at store #2695 from 2015 to 2020. Relator consistently received positive reviews of his performance.

120.    In 2019, Relator began to notice an inordinate number of expired drugs and drugs with no expiration dates or lot numbers on the bottles on the shelf. Relator states that the drugs without expiration dates or lot numbers were the result of presumably faulty ink on the medication bottles themselves. That is, when one pulled back the Walmart stick on label, the lot numbers and expiration dates, printed in the faulty ink, would come off as well and not be legible. This was a particular problem because many prescriptions (Relator estimates about 30%) which were filled were returned to stock if the customer did not pick it up in 9-10 days after it was submitted. When returning the drugs to stock the pharmacy would rip off the patient label and thus rip off the ink which set forth the lot numbers and expiration dates. These bottles of medications, without the expiration dates and lot numbers, would sit on the shelf for a period of time until another prescription for the same drug needed to be filled. When it was filled the pharmacist would have no idea what the expiration date was on these drugs.

121.    Since that time, and as described below, Relator made numerous complaints to management both verbally and in writing.

122.     Relator specifically recalls, for example, Pharmacy Technician Sharon Atkins on June 14, 2019 handed him a patient's medication for visual verification prior to dispensing. The medication did not have a lot number or expiration date.

123.     Relator informed Ms. Atkins at the time she handed him the medication that it was illegal to dispense these medications because they had no lot numbers or expiration dates. In response, Ms. Atkins laughed at Relator, and then proceeded to take the patient medication label and cover up the area, so to hide the fact these medications did not have the required lot numbers and did not have expiration dates. Relator refused to dispense the medication, informed Ms. Atkins that her behavior was inappropriate, and instructed her to stop dispensing medications without lot numbers or expiration dates.

124.     Ms. Atkins disobeyed Relator's requests and continued to give medications without expiration dates and lot numbers to Staff Pharmacist Jaime Levangie to dispense to beneficiaries and submit claims to payors. As a result, Ms. Levangie continued to dispense the misbranded and/or out of date drugs and bill payors, including Government Healthcare Programs for the drugs.

125.     Also, on June 14, 2019, Relator reported via text messaging to Pharmacy Manager Liza Otero (Martinez) that Walmart had misbranded and/or out of date medication on the dispensing shelves and the drugs needed to be removed. He noted that Ms. Atkins had refused to remove the misbranded and/or out of date drugs and continued to give these drugs to pharmacists to be dispensed.

126.     He also states that after this incident, pharmacist Levangie printed out the last page of Walmart return to stock procedures from Walmart's intranet and made all the pharmacy technicians and staff present in the pharmacy sign without reviewing the procedures. Realtor

refused to sign and placed an "X" instead of a signature page on the printout.  Upon information and belief, the Walmart store did this to cover up its actions and claim it was following policies.

127.    Again, on July 5, 2019. Relator reported via email to Ms. Otero and Staff Pharmacist Jaime Levangie that the out of date and misbranded drugs were still on the shelves and were being inappropriately dispensed to patients and billed to insurance companies.

128.    On July 6, 2019, Relator ultimately verbally requested Ms. Stein that his hours be reduced  from 80 hours every two weeks to 48 hours every two weeks, to be able to manage the stress he was experiencing related to the misconduct alleged herein and the retaliation. His hours were actually reduced to 48 hours on July 8, 2019.

129.    Additionally, Relator noted that beginning on July 6, 2019 through October 11, 2019, the pharmacist schedules in his Walmart store changed such that beginning July 6, 2019, Relator was very rarely scheduled to work with other pharmacists.

130.    Stated differently, typically in the Walmart pharmacy, there is significant overlap in pharmacists during the regular workday.  But after this date, July 6, 2019, Relator found very little overlap in his schedule and he was often working as the sole pharmacist at the store.  Relator believes this was to make him look less productive and so he could not witness other pharmacists dispensing and billing for misbranded and/or out of date drugs.

131.    In response to the schedule change which commenced on July 6, 2019, on August 26, 2019, Relator sent an email to Health Wellness Director Karen Stein and Pharmacy Regional Coordinator Chantilly Lebel asking them to review the pharmacist schedules at his store due to the changes and lack of overlap.

132.    Then on August 27, 2019, Relator sent a similar email complaining of the pharmacist work schedule to Ms. Otero via text messaging.

26

133.    Of particular concern, on September 5, 2019, Relator learned from a visiting relief pharmacist, RPH Ingrid Padilla, a pharmacist in Walmart store #1084 in Orlando, that the same volume of expired drugs and misbranded drugs exists in her store.

134.    More specifically, when pharmacist Padilla was working a shift with Relator she witnessed Relator receive an out of date or misbranded medication from a technician to dispense. Relator instructed the technician to return pull the expired or misbranded drugs from the shelves and that it was illegal to dispense and bill for these drugs.  About an hour in the shift, Ms. Padilla asked Realtor a question and he informed her that out of date and misbranded drugs were not being removed from the shelves and instead they were being handed to pharmacists to dispense and bill. He informed her this was illegal. Ms. Padilla responded by telling Relator that she would inform the pharmacy manager of the Walmart Store in Orlando, where she worked, that it was illegal to dispense and bill for misbranded and expired drugs, implying that it occurred regularly at the Walmart store in Orlando as well.

135.    Upon information and belief, the conduct alleged herein is occurring in other Walmart stores.  That is, other Walmart stores are dispensing and billing Government Healthcare Programs for misbranded and/or expired drugs.

136.    Having not seen anything done in response to his complaints about the misbranded and/or out of date drugs being dispensed and billed for at Walmart or the retaliatory conduct against Relator, he continued to complain, for example:

a.    On September 6, 2019 Relator sent an email to Karen Stein regarding the lack of overlap in the pharmacy schedule.

b.    On September 7, 2019 Relator emailed Rene Pabon regarding the discriminatory schedules.

27

      c.   On September 9, 2019 Relator sent an email to Rene Pabon regarding misbranded and expired drugs on the Walmart shelves and being dispensed to patients.

137.    Relator received the first response to his complaints on September 13, 2019.  Ms. Stein emailed him stating that Walmart has implemented a "Return to Stock" policy and Ms. Otero was training the pharmacy technicians to process and remove misbranded and/or out of date drugs from the shelves.

138.    However, even after this email, Relator noticed that the misbranded and/or out of date drugs were not removed, were still on Walmart's shelves and were still being dispensed and billed for by pharmacists.

139.    On October 5, 2019, Relator was disciplined by Ms. Stein for telling certified pharmacy technicians to check the pharmacy shelves and pull medication bottles without dates and lot numbers and expired drugs. More specifically, Relator was called into the back room where Ms. Stein and Patrick (Health and Wellness District Manager) were present and Ms. Otero was on speaker phone. Relator was told that he was impeding workflow by telling pharmacists to check the shelves.

140.    On October 5, 2019, Relator filed a complaint with OSHA concerning the Walmart disciplinary action taken against him and the expired and expired drugs.

141.    Again, on October 6, 2019, Relator informed Ms. Otero of an incident that occurred in June. Specifically, that pharmacy technician Sharon Atkins was not obeying his directives to not distribute out-of-date and misbranded drugs. He even noted that he witnessed Ms. Atkins hand Pharmacist Levangie misbranded and/or out-of-date drugs which she dispensed to a patient. Prior to handing the medication over, Ms. Atkins placed a patient information label over where the dates

28

and lot numbers should have been so Ms. Levangie could not see that the drug was misbranded and/or out-of-date.

142.    On October 6, 2019, the Relator took additional action by himself pulling the misbranded and out of date drugs from Walmart shelves, and developed an itemized list of the drugs he pulled with NDC numbers and expiration dates (if available).

143.    Also, on October 6, 2019, Relator emailed Pabon stating again that he worked on October 6, 2019 and misbranded and out-of-date medications were on the Walmart shelves.  He also stated that he continued to inform Stein and pharmacy technicians that this conduct is unlawful, and Stein was pressuring him to remain silent.  Relator mentioned that the pharmacy technicians were not heeding his direction to remove the misbranded and out-of-date prescriptions from the shelves.

144.    Then on October 8, 2019, Relator sent emails to the Walmart CEO Doug McMillion and Walmart Ethics Department informing both of the misbranded and expired medications on the Walmart shelves, that the pharmacy technicians were not taking his direction and removing the medications, that pharmacists were continuing to dispense misbranded and expired drugs and that he was being retaliated against for voicing concern.

145.    On October 11, 2019, Relator found expired drugs on the Walmart shelves, including three full plastic drawers of drugs with expiration dating back to February 2018.

146.    When Relator informed Ms. Stein of the expired drugs he found, Ms. Stein responded the same day, October 11, 2019, that the plan was to have a technician work through the drugs and pull the out of date drugs.  She further stated, anything pulled will be sent back "according to the normal outdate process."

147.    On the same day, Relator sent an email to Ms. Otero, Ms. Stein and Pabon with a list of expired drugs that were pulled October 6 through October 11, along with the expiration dates and NDC numbers that were on the Walmart shelves and were to be sold/dispensed to patients.

148.    On October 12, 2019, Relator again emailed Ms. Otero complaining of retaliatory conduct and showing that when he was scheduled to work there was minimal overlap with other pharmacists.

149.    On or around October 12-13, 2019, Walmart Global Investigations agent, Gary Smyth, called Relator concerning the email he sent to Mr. McMillion. Mr. Smyth asked Relator how high up in the Walmart Health and Wellness management did he contact concerning the misbranded and expired drugs. Relator responded by informing him he contacted Ms. Pabon. Mr. Smyth, satisfied, said he would follow up with Relator at a more convenient time.

150.    Subsequently, on October 14, 2019, Relator received an email from Mr. Smyth of the Walmart Global Investigations department requesting specifics as to his reporting of misbranded and expired drugs, *i.e.*, emails, who Relator spoke with or contact, the list of drugs, and pictures.

151.    In response, on October 15, 2019, Relator forwarded information from previous emails he sent to Walmart staff regarding expired and misbranded drugs to Mr. Gary Smyth (of the Walmart ethics department).

152.    Also, on October 14, 2019, Relator received an email from "Lauren" of the Walmart ethics department in response to Relator's submission. The email stated that Relator's retaliation concerns were being investigated and that the process would take 4-6 weeks.

153.    On October 14, 2019, Relator forwarded previous emails sent to Walmart staff regarding expired and misbranded drugs to Mr. Brandon Dill (of the Walmart investigations department).

154.    Finally, on October 15, 2019, Relator noted for the first time since his complaints that Ms. Stein and Ms. Atkins were pulling misbranded and/or out of date drugs from Walmart pharmacy shelves.  This resulted in 3-4 big boxes of medications being pulled.  Some of the drugs expired in 2018.

155.    In fact, the pharmacy technician assigned to the task, Kalista Saitta, complained about the enormity of the task and threatened to quit saying she had never seen so many drugs pulled for disposal.

156.    Individuals/agents from both the Walmart Global Investigations department (Brandon Dill) and ethics department were contacting Relator and investigating Relator's allegations concerning misbranded and/or out of date drugs and retaliation complaints.

157.    Relator emailed Mr. Dill on October 21, 2019 requesting to respond to his questions via email rather than have a meeting or telephone conference.

158.    On November 5, 2019, Ms. Smyth from Walmart Ethics Department and Relator spoke on the phone.  During this call, they discussed the misbranded and/or out of date medications and retaliation Relator had been complaining about in his various communications with Walmart supervisors. Mr. Smyth also asked a lot of questions regarding the volume and types of medications that were expired or misbranded. Mr. Smyth stated that he would forward the information you shared with Brandon Dill from the Walmart investigations department who was investigating the Relator's retaliation claims.

159.    On November 12, 2019, Relator received an email from Walmart stating that the investigation into his retaliation complaint against Walmart was closed and no action was taken.

160.    On December 30, 2019, Relator picked up his own prescription from Walmart store #2695.  Pharmacist Levangie dispensed his medication and billed his insurance company.  When Relator viewed the medication label, the ink setting forth the lot number and expiration date was faded, and thus, the expiration date and lot numbers were not visible.  The only date visible was the "discard by date" (a year from the date the drug is dispensed), which is automatically assigned by Connexus when the drug is dispensed.

**D.  Relator Was Retaliated Against For Engaging In Whistleblowing Activities**

161.    Relator re-alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

162.    As set forth above, Relator began noticing the conduct alleged herein in early 2019 and voicing concern via texts, emails, and conversations to superiors about the conduct in mid-June 2019.

163.    Weeks later, beginning July 5, 2019, Relator's schedule to work changed so that there was minimal overlap between himself and other pharmacists in an effort to isolate him from discussing his concerns or observing violations of law.

164.    Also, thereafter, Relator was disciplined for requiring the technicians in his pharmacy to perform their jobs, including the examination and removal of out of date drugs from the shelves. He was disciplined for unsubstantiated conduct in connection with his efforts to bring the pharmacy into compliance. He was disciplined because he refused to participate in any unlawful dispensation of drugs.

165.    On or about January 31, 2020, Plaintiff was placed on leave "while we resolve issues." No specific reasons were given for placing him on leave for an unspecified duration.

166.    On February 7, 2020, Relator was called back into the store manager's back office and was terminated by Ms. Stein. Ms. Stein had allegedly given a reason for the termination, however, due to Relator's hearing impairment he could not hear the reasons given for his termination.

**COUNT I**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(A)(1)(A)**

167.    Relator re-alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

168.    At all relevant times to this Complaint, Defendants knowingly presented, or caused to be presented, directly or indirectly false and fraudulent payment or approval to the United States.

169.    By virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, the United States suffered damages.

**COUNT II**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(A)(1)(B)**

170.    Relator re-alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

171.    At all times relevant to this Complaint, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid.

172.    By virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, the United States suffered damages.

## COUNT III
## FLORIDA FALSE CLAIMS ACT
### Fla. Stat. Ann. §68.082(2)(g)

173.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

174.     This is a claim for treble damages and penalties under the Florida False Claims Act.

175.     By virtue of the acts described above, Defendants knowingly submitted to officers, employees or agents of the State of Florida, false or fraudulent claims for payment or approval.

176.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to the Florida State Government to obtain payment from the State of Florida for false or fraudulent claims.

177.     By reason of the Defendants' acts, the State of Florida has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT IV
## RETALIATION
### 31 U.S.C. §3730(h)

178.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

179.     Defendant have a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an False Claims Act action.

180.     Relator took lawful actions in furtherance of a False Claims Act action, including but not limited to investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

181.    Despite a lack of prior disciplinary actions, Relator was wrongfully terminated by Defendant on February 7, 2020.

182.    Relator was discriminated against in the terms and conditions of her employment by Defendant, by and through its officers, agents, and employees because of lawful acts done by him in the furtherance of an action under the False Claims Act.

183.    The actions of Defendant damaged and will continue to damage Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

184.    Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

## REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in his favor and against Defendant for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes, with respect to the federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act. With respect to the Florida False Claims Act, this includes, an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2).

Further, Relator requests that he be awarded damages as a result of Defendant's violation of 31 U.S.C. § 3730(h), including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained as a result of the discrimination. Relator further requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: June 15th, 2020.                                Respectfully submitted,

_____
Donna Smith, Esq.
Florida Bar No. 661201

WENZEL FENTON CABASSA, P.A.
1110 North Florida Avenue, Suite 300
Tampa, FL 33602
Phone: 813-440-4593
Email: dsmith@wfclaw.com

SEEGER WEISS LLP
Shauna B. Itri (PA Bar No. 201611)
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Phone: (215) 553-7981
Email: sitri@seegerweiss.com